# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JOHN HENSLEY,

    *Plaintiff*,

v.

UNITED STATES OF AMERICA,

    *Defendant*.

Civil Action No. 16-1389 (TJK)

## MEMORANDUM OPINION

Plaintiff John Hensley ("Hensley"), a former Staff Sergeant in the West Virginia Air National Guard, suffered a serious shoulder injury when he fell from an aircraft in 2008. In 2013, he submitted a claim for $100,000 under an insurance program for members of the military who have suffered traumatic injuries, Servicemembers' Group Life Insurance Traumatic Injury Protection ("TSGLI"). The Air Force denied Hensley's claim, concluding that Hensley had not shown that his injury qualified him for TSGLI benefits. Hensley sought review before the Air Force Board for Correction of Military Records (the "AFBCMR" or "Board"), which declined to grant his application. Hensley then brought this lawsuit against the United States (the "Government"), asserting that the AFBCMR's decision should be reversed on the ground that it was arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*

Hensley and the Government have cross-moved for summary judgment. *See* ECF No. 9 ("Pl.'s Mot."); ECF No. 13 ("Def.'s Cross-Mot."); *see also* ECF No. 15 ("Pl.'s Reply"); ECF No. 17 ("Def.'s Reply"). For the reasons explained below, Hensley's motion will be granted in part and denied in part, and the Government's motion will be denied.

**I.      Background**

   **A.      The TSGLI Program and Claims Process**

Members of the U.S. armed services are automatically enrolled in the Servicemembers' Group Life Insurance program, although they may opt out. *See* 38 U.S.C. § 1967; *Ridgway v. Ridgway*, 454 U.S. 46, 50-54 (1981) (describing origins of program). TSGLI is an automatic rider to that insurance and covers traumatic injury. *See* 38 U.S.C. § 1980A; *Austin v. Prudential Ins. Co. of Am.*, No. SA-12-CA-473, 2013 WL 12094176, at *2 (W.D. Tex. Apr. 5, 2013).

"To receive TSGLI benefits, a service member must have suffered a 'qualifying loss.'" *Austin v. United States*, 614 F. App'x 198, 200 (5th Cir. 2015) (quoting 38 U.S.C. § 1980A(a)(1)). By regulation, the government has promulgated a schedule of losses describing the types of injuries that are covered. 38 C.F.R. § 9.20(f). They include traumatic non-brain injuries "resulting in an inability to perform at least 2 Activities of Daily Living (ADL)." *Id.* § 9.20(f)(20). "The statute recognizes six ADLs: bathing, continence, dressing, eating, toileting, and transferring (in or out of a bed or chair)." *Austin*, 614 F. App'x at 200 (citing 38 U.S.C. § 1980A(b)(2)(D)). "TSGLI will pay $25,000 for each consecutive 30-day period of ADL loss, up to a maximum of $100,000 for 120 consecutive days." *Id.*

The Fifth Circuit has summarized the TSGLI claims process as follows:

> To apply for benefits, a plan participant must file a form SGLV 8600 with his service branch. This form has two parts: Part A, to be filled out by the claimant, and Part B, the "Medical Professional's Statement," in which the claimant's physician must certify the qualifying losses claimed. . . .
>
> The claim is then reviewed by a certifying official at the claimant's branch of service. If that official approves any benefits, he instructs . . . the private insurance company that administers the TSGLI program[] to pay such benefits and to notify the claimant if any part of the claim has been denied.

*Id.* at 200.  Within a year of the initial decision, service members may appeal in writing "to the office of the uniformed service identified in the decision regarding the member's eligibility for the benefit."  38 C.F.R. § 9.20(i)(1).

Benefits decisions may be further appealed to the relevant board for correction of military records, such as the AFBCMR.  *See, e.g.*, *Blackwood v. United States*, 187 F. Supp. 3d 837, 839 (W.D. Ky. 2016).  Such boards may act "to correct an error or remove an injustice."  10 U.S.C. § 1552(a)(1).  In AFBCMR proceedings, the "applicant has the burden of providing sufficient evidence of material error or injustice."  32 C.F.R. § 865.4(a).  The AFBCMR panel appointed to hear the case may request advisory opinions and information from other Air Force officials, in which case the applicant will be given the opportunity to respond.  *See id.* § 865.4(a)(1), (b).  The panel may also, in its discretion, order a hearing or request additional information from the applicant.  *See id.* § 865.4(a)(2), (d).

Dissatisfied applicants for TSGLI benefits may also seek review in federal district court.  District courts have original jurisdiction to hear civil actions against the United States relating to TSGLI.  *See* 38 U.S.C. § 1975.

### B. Hensley's Injury and Medical Treatment

On February 20, 2008, Hensley slipped on an icy ladder while inspecting an aircraft and fell head-first approximately 15 feet.[1]  AR 2 [2], 80 [49], 553 [80], 659 [87], 778 [92].  Hensley's most serious injuries were to his left shoulder: he suffered a fractured humerus, a torn labrum, and possible ligament damage.  AR 2 [2], 80 [49], 778 [92].  He received prompt medical attention at a local hospital, where he was given a sling and advised to consult an orthopedist.

---

[1] The parties have jointly filed the relevant excerpts from the administrative record on ECF.  ECF No. 18-1 ("AR").  When citing the record, the Court will provide the page number as it appears at the bottom of the page, followed by the page number generated by ECF in brackets.

AR 2 [2], 70 [42], 82 [51], AR 553 [80]. At that time, he was ordered to remain off work for a week and to do no lifting with his left arm. AR 82 [51]. On February 25, 2008, he saw the orthopedist, who provided him with a shoulder immobilizer, prescribed him painkillers, and concluded that he would likely have to remain off work for three months. AR 553-54 [80-81]. In March, Hensley began physical therapy three times per week. AR 545 [82]. It appears that Hensley ultimately returned to work on April 21, 2008, but only on "light duty" (with limitations on activities such as lifting and overhead work) as recommended by his orthopedist. AR 75 [44], 83 [52], 540 [78], 659 [87].

Hensley's medical and physical-therapy records show that he continued to suffer pain and a limited range of motion in his left shoulder over the next six months. For example, on May 19, Hensley's therapist reported that his shoulder "is still very weak & pain in all planes of motion." AR 492 [74]. The next day, the orthopedist reported that Hensley's left shoulder "show[ed] much better range of motion," and that Hensley was "[s]till having pain, but overall doing okay." AR 83 [52]. On June 30, Hensley's therapist noted that he had "numbness" in his left hand. AR 498 [76]. Hensley also reported "pain and weakness w/ overhead activities" and "difficulty w/ gripping items." *Id.* On August 19, Hensley said that "numbness & tingling in arm & shoulder bother him," that he had pain when reaching overhead, and that he was "unable to grip onto things." AR 76 [45]. Nonetheless, his orthopedist ordered him discharged from physical therapy at that point. *Id.*

The records contain a few explicit references to Hensley's ability to perform ADLs. A note from his physical therapist, dated April 9, 2008, stated that he was "still limited at home w/ self care and home care ADLs." AR 495 [75]. On November 18, 2008, Hensley underwent a "functional capacity evaluation" with a physical therapist at the request of his orthopedist, who

4

wanted to determine whether Hensley could be released from light duty. AR 68 [40], 468 [56]. Hensley reported that he continued to avoid using his left arm due to pain. AR 476 [64]. In a written questionnaire, he checked "no" when asked if he needed "regular assistance with dressing." AR 377 [55]. He added, "well I use slip on shoes so I don't need help, but it is tuff to do my work boots." *Id.* The official report of the evaluation, dated December 11, 2008, recorded further comments from Hensley on dressing and bathing:

> I have some difficulty but I can do it. Getting in and out of the deep whirlpool tub which I use every day because it makes the pain better (no grab bars), getting work boots on because I have to tie them and tuck the strings in (up to mid-calf). My son will often help me get them off at the end of the day.

AR 472 [60]. Hensley also reported that he could not yet do many household chores such as mowing the lawn or vacuuming. *Id.* The therapist recommended that Hensley remain on light duty due to his poor balance when using a ladder and his inability to reach overhead. AR 471 [59].

Hensley continued to experience pain after November 2008. In June 2009, he had surgery to repair the torn labrum in his shoulder. AR 764 [91].

### C. Procedural History

In April 2013, Hensley applied for $100,000 in TSGLI benefits, claiming that his shoulder injury had left him unable to dress and bathe himself without assistance for at least 120 days, from February 20, 2008, to August 20, 2008. AR 2 [2], 37-39 [21-23]. His application included a signed certification of his claim by a physician, Dr. Hopkins. AR 32-39 [16-23]. Dr. Hopkins indicated that he had not personally observed Hensley's injuries, but had instead reached his conclusions based on a review of Hensley's medical records. AR 39 [23].

On June 27, 2013, the insurance company that administers the TSGLI program notified Hensley by letter that his claim had been denied. AR 41 [24]. The letter explained that "the

5

medical documentation provided does not indicate that your loss met the standards for TSGLI," and that "a claimant must have been unable to independently perform at least two activities of daily living (ADLs) for a period of 30 consecutive days." *Id.* The letter further explained that an applicant is unable to perform an ADL "independently" if he requires either "physical assistance," "stand-by assistance," or "verbal assistance" to do so. *Id.* The letter explained that Hensley could appeal the decision to "AFPC/DPFCS." AR 41-42 [24-25].[2]

Hensley appealed, and received a letter from "AFPC/DPFD" denying his appeal on October 10, 2013. AR 44 [27]. The letter explained: "We re-examined your claim and additional documents provided with your appeal package. Unfortunately, the medical documentation does not support that you were unable to perform at least two of the six activities of daily living (ADLs) for at least 30 consecutive days." *Id.* The letter further explained that Hensley could appeal again to the AFBCMR or file suit in federal court. *Id.*

Hensley then appealed to the AFBCMR. In March 2014, he filed a brief arguing that an error or injustice existed because (1) the denial of benefits was arbitrary in light of the medical evidence and the signed doctor's statement supporting Hensley's claim and (2) the Air Force had failed to adequately advise Hensley of the reason for the denial. AR 16-17 [10-11].

The AFBCMR sought an advisory opinion from "AFPC/DPFC" (apparently the same office that had handled Hensley's initial appeal). AFPC/DPFC issued a memorandum from Stephen T. Rose dated May 15, 2014 (the "Rose Memo"). AR 778-81 [92-95]. The Rose Memo laid out the standard for awarding TSGLI benefits, and then relayed discussions with the doctors who had reviewed Hensley's initial application and earlier appeal. AR 778-80 [92-94]. Those

---

[2] The Court notes that AFPC/DPFCS is one of several Air Force acronyms in the record that the parties have regrettably not bothered to explain in their briefing. "AFPC" appears to refer to the Air Force Personnel Center. *See* AR 778 [92].

6

doctors were not named in the Rose Memo. *See id.* The doctor who had reviewed the initial application opined that Hensley had shown loss of only one ADL (the ability to bathe himself) and only for 60 days. AR 779 [93]. The doctor noted that Hensley "returned to work within one week after the accident and beginning 21 April could use his left (non-dominant) arm for minimal activities." *Id.* He further reasoned that "therapy notes mention limitations with self-care ADLs, but the ROM [range-of-motion] measurements and treatment (sling only with no mention of movement restrictions) suggest that he had the capacity to dress himself." AR 779-80 [93-94].

The second doctor, who had reviewed Hensley's first appeal, reached a similar conclusion:

> The SM's [service member's] legal representative . . . contends that having one arm limited in function made it impossible for SM to dress himself without assistance. There is no direct evidence in the medical record that the SM could not dress himself due to functional limitations in his non-dominant left arm. [The legal representative] cites a note from physical therapy in April 2008 that stated "patient is still limited at home with self care and ADLs." This is a non-specific comment and there is no evidence in the medical records provided that SM could not perform some or all ADLs without assistance. "Still limited" could just as easily mean that it took the SM longer to perform some or all ADLs. By the time this comment was made in the medical record, the SM had already been performing light duty at work for 2 months. [The legal representative] also insists the SM could not put on his shirt and pants due to lack of motion, limitations, weakness, and the inability to perform overhead activities with his left arm (such as SM pulling a shirt over his head.) All of that disregards the fact that the SM had a perfectly good right arm and the SM is right-handed. SM had persistent limitations in range of motion in the left shoulder as well as weakness of grip and these symptoms extended well past 20 August 2008 but they did not create a medical necessity for assistance with dressing AND bathing for even 30 days, let alone the 120 days which SM claims.

AR 780 [94]. The second doctor also addressed Dr. Hopkins' certification, noting that Dr. Hopkins "indicated he DID NOT observe the SM's loss and I assume he had no more information about SM's case than what was in the medical records submitted for review." *Id.*

After summarizing these conversations, the Rose Memo provided the following analysis:

> On 21 Apr 2014, we received Staff Sergeant Hensley's AFBCMR application asking that his TSGLI claim be approved. The burden of proof is on Staff Sergeant Hensley to demonstrate he suffered a scheduled loss as a result of his traumatic event. After reviewing the original claim and appeal, our position remains firm that Staff Sergeant Hensley does not meet TSGLI criterion for ADL loss due OTI for any payable threshold. It is reasonable to believe that having an arm in a sling may make bathing and dressing more difficult; however, it is also reasonable to believe that Staff Sergeant Hensley would be able to use the uninjured arm to perform the basic functions albeit at a slower pace.

AR 781 [95]. Based on that analysis, the Rose Memo recommended that the AFBCMR deny Hensley's appeal. *Id.*

In June 2014, Hensley filed a letter in response to the Rose Memo. AR 783-84 [97-98]. In the letter, Hensley interpreted the memo as concluding "that the medical information was not clear enough that SSGT Hensley in fact did suffer significant ADL loss." AR 783 [97]. In order to "clarify" that issue, Hensley submitted an affidavit from his wife dated June 18, 2014. AR 783 [97], 785 [99]. In the affidavit, Hensley's wife stated that, "[d]uring the time period after his injury, I provided John both stand by and physical assistance with bathing, washing hair, dressing, and undressing." AR 785 [99]. The affidavit stated that Hensley "also needed assistance" sitting up and using the bathroom. *Id.* The affidavit further stated that "Dr. Hopkins [sic] conclusion that John needed assistance with ADLs from at least between February, 20, 2008 and August 20, 2009 [sic] is consistent with what I did for John, and witnessed as John's caretaker." *Id.* His wife concluded by noting that, "[t]o this day, John still needs my help in

8

performing some tasks." *Id.* Hensley offered to make his wife available for testimony before the AFBCMR. AR 783 [97].

In March 2015, the AFBCMR denied Hensley's appeal. The Board's record of proceedings summarized Hensley's arguments, some of the key facts in the record, the Rose Memo, and Hensley's response. AR 2-6 [2-6]. The Board then concluded as follows:

> Insufficient relevant evidence has been presented to demonstrate the existence of error or injustice. After a thorough review of the available evidence and the applicant's complete submission we are not persuaded the applicant's TSGLI application should be approved. We note the applicant's spouse provides a sworn affidavit stating the applicant loss [sic] 120 days of ADL and still requires assistance due to the ongoing nature of his injuries. However, in our opinion, substantial evidence has not been presented to successfully refute the assessment of his case by the Air Force Office of Primary Responsibility (OPR). Therefore, we agree with the opinion and recommendation of the Air Force OPR [*i.e.*, the Rose Memo] and adopt the rationale expressed as the basis for our decision that the applicant has failed to sustain his burden of proof of either an error or an injustice. Absent persuasive evidence that he was denied rights to which he was entitled, we find no basis to recommend granting the relief sought in this application.

AR 5-6 [5-6]. The AFBCMR further concluded that a hearing would not materially advance its understanding of the facts presented on the record. AR 6 [6].

In June 2016, Hensley filed the instant lawsuit. He alleges that the AFBCMR's decision was arbitrary and capricious insofar as it:

> did not provide justification as to why the greater weight of the evidence did not support [Hensley's] eligibility for TSGLI benefits; give any reasons why the certifying medical professional's certification was not credible; address the Affidavit of Ms. Hensley attesting to her observations and provision of assistance to [Hensley] during his recovery; or provide reasonable or substantial evidence or medical opinion contradicting [Hensley's] claim for TSGLI benefits.

ECF No. 1 ¶ 35. The parties subsequently filed the instant cross-motions for summary judgment.

9

## II. Standard of Review

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "The 'entire case' on review is a question of law." *Id.* "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Alston v. Lew*, 950 F. Supp. 2d 140, 143 (D.D.C. 2013).

"Under the Administrative Procedure Act, a court may set aside an agency's final decision only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ams. for Safe Access v. DEA*, 706 F.3d 438, 449 (D.C. Cir. 2013) (quoting 5 U.S.C. § 706(2)(A)). "[I]n judicial review of agency action, weighing the evidence is not the court's function. Rather, the question for the court is whether there is 'such relevant evidence as a reasonable mind might accept as adequate to support' the agency's finding . . . ." *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. PBGC*, 707 F.3d 319, 325 (D.C. Cir. 2013) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). Courts "will not disturb the decision of an agency that has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Ams. for Safe Access*, 706 F.3d at 449 (alterations and internal quotations omitted). The agency must provide only a "brief statement" of its decision, *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quoting 5 U.S.C. § 555(e)), and courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *id.* at 1351-52 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*

10

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). However, the court "may not supply a reasoned basis for an agency action that the agency itself did not give in the record under review." *Pierce v. SEC*, 786 F.3d 1027, 1034 (D.C. Cir. 2015). Moreover, "an agency's failure to respond meaningfully to objections raised by a party renders its decision arbitrary and capricious." *PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 208 (D.C. Cir. 2011) (alterations and internal quotations omitted).

In this Circuit, decisions by boards for correction of military records are typically reviewed "under an 'unusually deferential' application of the arbitrary or capricious standard." *Maneely v. Donley*, 967 F. Supp. 2d 393, 401 (D.D.C. 2013) (quoting *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989)). This particularly deferential standard stems from statutory language providing that the Secretary of each service branch "*may* correct any military record . . . when the Secretary *considers it necessary* to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1) (emphasis added); *see Kreis*, 866 F.2d at 1513-15. Given this language, "[p]erhaps only the most egregious decisions may be prevented." *Kreis*, 866 F.2d at 1515. Courts have reasoned that this standard is further justified because "courts are particularly unfit to review the substance of military personnel decisions." *Ey v. McHugh*, 21 F. Supp. 3d 49, 55 (D.D.C. 2014). Courts have thus applied the "unusually deferential" standard to cases involving personnel decisions based on medical evidence. *See Maneely*, 967 F. Supp. 2d at 400-01. However, courts have held that this deferential standard, while warranted in "a traditional military personnel matter," is not always appropriate. *Remmie v. Mabus*, 898 F. Supp. 2d 108, 118-19 (D.D.C. 2012). In particular, when deciding legal issues regarding whether an agency has properly adhered to its procedures, courts have afforded no more deference than they do when reviewing the decisions of civilian agencies. *See id.*

11

As the Government notes, no court in this Circuit has addressed whether the unusually deferential standard should apply when reviewing decisions by boards for correction of military records in cases involving claims for TSGLI benefits. *See* Def.'s Cross-Mot. at 4. Hensley has argued that TSGLI decisions should not receive unusually deferential review, and the Government has agreed, requesting no greater deference than that afforded by the traditional arbitrary-and-capricious standard. *See* Pl.'s Mot. at 4; Def.'s Cross-Mot. at 4-6. Because neither party has suggested that the Court should apply the unusually deferential standard in this case, the Court will apply the traditional standard of review.

### III. Analysis

Hensley makes a number of arguments for why the AFBCMR's decision was arbitrary and capricious. These arguments are largely aimed at the Rose Memo, whose conclusions the AFBCMR adopted as its own. Specifically, Hensley argues that the Rose Memo improperly relied on the opinions of unnamed doctors, *see* Pl.'s Mot. at 11, misapplied the standard for awarding TSGLI benefits by imposing a requirement of "medical necessity," *see id.* at 11-13, relied on speculation and disregarded the medical evidence in the record and Dr. Hopkins' certification, *see id.* at 9-10, and failed to consider Hensley's wife's affidavit, *see id.* at 13; Pl.'s Reply at 1-3. The Court will consider these arguments in turn.

"As a preliminary matter, the Board did nothing improper by relying on an advisory opinion to render its decision." *McDonough v. Stackley*, 245 F. Supp. 3d 1, 5 (D.D.C. 2017); *see Roberts v. United States*, 741 F.3d 152, 158-59 (D.C. Cir. 2014); *Jackson v. Mabus*, 56 F. Supp. 3d 1, 8-9 (D.D.C. 2014). Rather, boards routinely adopt such advisory opinions, and may do so provided that the opinions themselves are not arbitrary and capricious. *See McDonough*, 245 F. Supp. 3d at 5.

Hensley's first two arguments, that the Rose Memo improperly relied on unnamed doctors' opinions and wrongly imposed a requirement of "medical necessity," are easily disposed of. "It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review." *Wallaesa v. FAA*, 824 F.3d 1071, 1078 (D.C. Cir. 2016) (emphasis omitted) (quoting *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004)), *cert. denied*, 137 S. Ct. 389 (2016). Hensley had the opportunity to raise both of these objections to the Rose Memo but did not do so. *See* AR 782-86 [96-100]. The AFBCMR's decision cannot be deemed arbitrary and capricious for failing to address arguments that Hensley never made.

In any event, these two arguments do not appear to hold water. Hensley has cited no authority for the proposition that a board for correction of military records must identify its in-house medical experts by name in an advisory opinion summarizing their views. Nor does the argument regarding "medical necessity" have any merit. One of the doctors in the Rose Memo concluded that Hensley had not shown "a medical necessity for assistance with dressing AND bathing for even 30 days." AR 780 [94]. Hensley argues that the doctor thereby imposed a new standard of "medical necessity" in the sense of "something ordered by a medical doctor, like a prescription." Pl.'s Mot. at 11. The Court is not persuaded. Hensley does not dispute that an applicant must show that he "required" assistance with ADLs to receive TSGLI benefits; indeed, he sought to meet this standard before the agency. *See* AR 20 [14]. It is only logical that a doctor reviewing Hensley's medical records would characterize a necessity arising from his injury as "medical necessity." The statement thus merely represents one doctor's application of the appropriate standard.

Hensley further argues that the Rose Memo improperly disregarded the medical evidence in the record, as well as Dr. Hopkins' statement, and instead relied on "speculation." *See* Pl.'s Mot. at 9-10. As an initial matter, Hensley nowhere suggests that the doctors who reviewed his earlier application did not have all of the relevant medical records he ultimately submitted to the AFBCMR for review. Moreover, the Rose Memo's conclusions—that the medical records do not directly show that Hensley required assistance to bathe and dress himself, and that he could have continued to do so using his uninjured right arm, *see* AR 781 [95]—appear to have at least some evidentiary support in the medical records.[3] And as other courts have held in TSGLI cases, the AFBCMR was justified in attaching little or no weight to Dr. Hopkins' certification for the very reason stated by the unnamed doctors in the Rose Memo: that it was made years after the injury on the basis of the medical records alone, not first-hand knowledge. *See Coker v. United States*, No. 3:15-cv-202 (JHM), 2016 WL 7242727, at *6 (W.D. Ky. Dec. 14, 2016); AR 780 [94]. Therefore, this argument, on its own, would likely not be enough to conclude that the AFBCMR's decision was arbitrary and capricious.

---

[3] The Court notes a potential error in the Rose Memo that arguably draws its persuasiveness into question. One of the unnamed doctors stated that Hensley "had already been performing light duty at work for 2 months" by April 9, 2008, when his physical therapist reported that he was "still limited at home with self care and ADLs." AR 780 [94]. Similarly, the other doctor stated that Hensley had returned to work one week after the accident. *See* AR 779 [93]. Both statements appear to be incorrect, because Hensley seems to have returned to work on April 21, 2008, two months after the injury and after the date of the physical therapist's report. *See* AR 495 [75], 540 [78]. It is possible that these statements reflect an incomplete review of the record: Hensley was initially ordered to stay off work for only a week but appears to have subsequently been ordered to stay off work for a longer period of time. *See* AR 82 [51], 540 [78], 553-54 [80-81]. Nonetheless, Hensley overlooked this potential error both before the agency and in his briefing on summary judgment. Because the parties have not briefed the issue, the Court will not conclude on this basis that the AFBCMR acted arbitrarily in adopting the Rose Memo.

Hensley is on firmer ground, however, when he claims that the advisory opinion failed to address his wife's affidavit. *See* Pl.'s Mot. at 13; Pl.'s Reply at 1-3. An advisory opinion, like any agency decision, is arbitrary and capricious if it fails to address meaningful objections that have been put before the agency. *PSEG Energy*, 665 F.3d at 208. As a corollary, it is arbitrary and capricious for an agency to adopt an advisory opinion that addresses only the arguments and evidence contained in an applicant's prior submissions if the applicant has since presented new arguments or evidence. *See McDonough*, 245 F. Supp. 3d at 5-7.

The Rose Memo obviously did not consider the affidavit of Hensley's wife, which Hensley submitted in response to the memo.[4] Therefore, the AFBCMR had to grapple with that new evidence and could not rely on the Rose Memo to do so. The AFBCMR's decision addressed the affidavit as follows: "We note the applicant's spouse provides a sworn affidavit stating the applicant loss [sic] 120 days of ADL and still requires assistance due to the ongoing nature of his injuries. However, in our opinion, substantial evidence has not been presented to successfully refute the assessment of his case by the Air Force Office of Primary Responsibility (OPR)." AR 5 [5]. The issue is whether those two sentences provide a "rational connection between the facts found and the choice made." *Ams. for Safe Access*, 706 F.3d at 449. Hensley argues that they do not, and that the AFBCMR failed to justify disregarding the affidavit. *See* Pl.'s Mot. at 10, 13. He cites cases holding that such "caregiver statements" are significant

---

[4] The Court also notes that neither the AFBCMR's decision nor the Rose Memo addressed Hensley's argument that the Air Force's earlier decisions, in addition to being substantively incorrect, had not adequately explained their reasoning. *See* AR 2-6 [2-6], 16-17 [10-11], 778-81 [92-95]. But Hensley has not resumed that argument in his briefing to this Court, and so the Court has no basis to conclude that this was a nonfrivolous argument that the Board was obligated to address.

15

evidence and must be addressed in TSGLI administrative proceedings. *Id.* at 13 (citing *Koffarnus v. United States*, 175 F. Supp. 3d 769, 778-79 (W.D. Ky. 2016)).

The Government offers two reasons why the AFBCMR's treatment of the affidavit was proper. First, the Government argues, the AFBCMR did in fact weigh all the relevant evidence; it simply concluded that the affidavit, "even coupled with [Hensley's] other submissions," did not "overcome the contents of the medical records generated contemporaneously with the 2008 injury." Def.'s Cross-Mot. at 23. Second, according to the Government, the Board could have given the affidavit no weight at all because it was "untrue" and "fraudulent." *Id.* The Government points to several documents in the record suggesting that Hensley was in fact separated from his wife and in a relationship with another woman while he was recovering from the accident in 2008. *See id.* at 25 (citing AR 231 [53], 553 [80], 660 [88]). The Government infers from those documents that Hensley's wife was not in a position to make the observations set forth in her affidavit and must have lied. *See id.* at 23-26. Thus, the Government argues, the Board had a "rational basis" for disregarding the affidavit. *See* Def.'s Reply at 3-4.

The problem for the Government is that it is not enough for there to be some plausible basis for the Board's decision; the Board must express its reasons for reaching that decision. Courts will, of course, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Amerijet*, 753 F.3d at 1351-52. Thus, courts have been willing to conclude that an agency "implicitly" considered and rejected evidence it did not "explicitly address" where that evidence was obviously of no value. *Roberts*, 741 F.3d at 159. And courts have affirmed decisions by boards for correction of military records even when those decisions were "thinner than [they] should have been." *Jackson v. Mabus*, 808 F.3d 933, 938 (D.C. Cir. 2015). But courts may not "supply a reasoned basis for an agency action that the agency itself

did not give in the record under review." *Pierce*, 786 F.3d at 1034. Thus, when boards for correction of military records have rejected key evidence that, if true, would clearly establish the applicant's entitlement to relief, courts have been unwilling to infer reasons that the boards did not give. *See Haselwander v. McHugh*, 774 F.3d 990, 999-1000 (D.C. Cir. 2014). And an agency may not provide conclusory statements in place of genuine reasoning, because "[c]onclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of [judicial] review." *AT&T Wireless Servs., Inc. v. FCC*, 270 F.3d 959, 968 (D.C. Cir. 2001).

The Court cannot discern from the conclusory statements in the record why the Board discounted the affidavit of Hensley's wife, which if fully credited would establish his claim for TSGLI benefits. Nothing in the AFBCMR's decision suggests that it found the affidavit to be fraudulent. The AFBCMR made no findings of fact about the affidavit's credibility; it merely summarized the affidavit's contents. *See* AR 5 [5]. And the AFBCMR's decision does not mention any of the record evidence on which the Government now relies to argue that the affidavit was fraudulent (that is, the documents suggesting that Hensley and his wife were separated in 2008). *See* AR 2-6 [2-6]. Nor did the Board refer to any other record evidence suggesting that the affidavit, even if not intentionally dishonest, should be given limited weight. *See id.* This Court may not supply the reasons for a credibility finding that the AFBCMR never even hinted at.

The D.C. Circuit's decision in *Haselwander* is instructive. There, a veteran who had served in Vietnam sought to correct his medical records, which did not reflect that he had been wounded in action and thus made him ineligible to receive the Purple Heart. *See* 774 F.3d at 991. In support of his application, he provided contemporaneous photographs of his medical

17

treatment and a list of references who would corroborate his story. *See id.* After the board for correction of military records denied his initial application, he moved for reconsideration and provided additional evidence: a letter from another veteran corroborating his story and official reports of the events on the day he was wounded. *See id.* at 992. The board noted that "letters of support . . . clearly state that the applicant was wounded in action," but concluded there was insufficient evidence to support his claim because there was "no available medical record to corroborate the photograph." *Id.* (emphasis omitted). The D.C. Circuit held that the board's reasoning defied logic: the entire purpose of the plaintiff's application was to correct the allegedly deficient medical records, yet the board had failed to explain why the evidence submitted was insufficient to warrant a correction. *See id.* at 992-93. The court noted that the board had "never found that any of the evidence submitted by [the plaintiff] lacked credibility." *Id.* at 999. Moreover, the board had stated its conclusion that the evidence was insufficient in "boilerplate" language that merely parroted the relevant legal standard. *Id.*

This case has many parallels with *Haselwander*. The AFBCMR adopted the reasoning of the Rose Memo, which had concluded—based on the unnamed doctors' review of Hensley's medical records—that it was "reasonable to believe that Staff Sergeant Hensley would be able to use the uninjured arm to perform the basic functions albeit at a slower pace." AR 781 [95]. But that conclusion was based in part on the doctors' reasoning that there was "no direct evidence in the medical record that [Hensley] could not dress himself" and that Dr. Hopkins' certification was unpersuasive because he lacked first-hand knowledge of Hensley's medical treatment. AR 780 [94]. As in *Haselwander*, the critical question before the Board was why the additional direct evidence provided—here, the affidavit of Hensley's wife—did not adequately fill the gap that the Board had identified in the medical records. The AFBCMR, like the board in

18

*Haselwander*, provided a summary of the affidavit that made its significance clear: if true, it would entitle Hensley to the relief he sought. *See* AR 5 [5]. Nonetheless, like the board in *Haselwander*, the AFBCMR failed to engage with that evidence in a meaningful way.

Of course, there may well be a good reason for the Board to find that Hensley's wife was lying; or that her memory was unreliable six years after the fact; or that even if the affidavit was mostly true and Hensley's wife had in fact assisted him with bathing and dressing as she claimed, the medical records still compelled the conclusion that her assistance was not actually required because Hensley could have performed those tasks on his own, albeit more slowly. But instead of pausing to make any such finding, the AFBCMR—again, like the board in *Haselwander*—skipped ahead to conclude, in boilerplate language, that "substantial evidence has not been presented to successfully refute the assessment of his case by the Air Force Office of Primary Responsibility." AR 5 [5].[5]

In short, the AFBCMR's decision "omitted the critical step—connecting the facts to the conclusion." *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995). Instead, its analysis consisted of a conclusory statement "without providing an account of how it reached its results." *Id.* For that reason, the Board "has not adequately explained the basis for its decision." *Id.* The Court therefore concludes that the Board's decision was arbitrary and capricious.

While the Court will grant Hensley's motion to the extent he seeks remand to the Board, it will deny his motion to the extent he seeks an instruction that he be awarded the full amount of

---

[5] Moreover, it is unclear whether this was even the right boilerplate. Neither party has pointed the Court to any authority that describes the AFBCMR's standard of decision as requiring applicants to show "substantial evidence . . . to successfully refute" the decision of the relevant Air Force office. At the same time, Hensley has not argued that this sentence misstated the relevant standard of decision, and so the Court does not rely on this point in deciding that the decision is arbitrary and capricious.

his claim. *See* Pl.'s Mot. at 14. The Court has not concluded that the record compels such an outcome. The flaw in the AFBCMR's decision was that it failed to adequately explain its reasoning, and there is no guarantee whatsoever that a well-reasoned decision will be favorable to Hensley. Therefore, the correct remedy is to vacate the AFBCMR's decision and to remand the case. *See, e.g., Banner Health v. Price*, 867 F.3d 1323, 1356-57 (D.C. Cir. 2017); *Bates v. Donley*, 935 F. Supp. 2d 14, 26 (D.D.C. 2013); *Remmie*, 898 F. Supp. 2d at 119-20.

## IV. Conclusion

For all of the above reasons, the Court, in a separate order, **GRANTS IN PART** and **DENIES IN PART** Hensley's motion, **DENIES** the Government's motion, **VACATES** the AFBCMR's decision, and **REMANDS** the case to the AFBCMR for further proceedings consistent with this Opinion.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: February 22, 2018